IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

```
THE READLYN TELEPHONE COMPANY, )
                               )    No. 6:10-cv-2040-JEG-RAW
          Plaintiff,           )
vs.                            )
                               )
QWEST COMMUNICATIONS           )
CORPORATION,                   )
                               )
          Defendant.           )
-------------------------------)
SULLY TELEPHONE ASSOCIATION,   )    No. 4:10-cv-00218-JEG-RAW
                               )    (SDIA - Central Division)
          Plaintiff,           )
                               )    RULING ON QWEST'S MOTIONS
vs.                            )    TO COMPEL DISCOVERY
                               )
QWEST COMMUNICATIONS           )
CORPORATION,                   )
                               )
          Defendant.           )
```

Qwest's "emergency" [113] (in Readlyn) and "expedited" [90] (in Sully) motions to compel from Readlyn Telephone Company and Sully Telephone Association (collectively "the LECs"[1] unless otherwise indicated) in these Tier 2 cases are before the Court. The LECs resist. The motions are decided on the motion papers. LR 7.c.

The issue concerns the discoverability and use in these cases of documents originally produced under "Protective Agreements" in proceedings before the Iowa Utilities Board (the "IUB documents"). The Court will grant the request for expedited relief in view of the soon-to-occur Rule 30(b)(6) deposition in the

---

[1] Readlyn and Sully are incumbent local exchange carriers.

Readlyn case (the Sully case is not as far along in discovery) and the demand of both LECs that the IUB documents in Qwest's possession be destroyed under the terms of the Protective Agreements.

Readlyn and Sully were not parties in the IUB proceeding. Qwest subpoenaed documents from them. The LECs agreed to produce the documents subject to identical Protective Agreements.

The Protective Agreement prohibits the disclosure of "Stamped Confidential Documents" except to identified persons. (Readlyn Resist. Ex. A [115-1] ¶¶ 2, 3). Apparently all of the IUB documents produced by the LECs were stamped Confidential. The Agreement contemplates that confidential documents may be subject to "subpoenas or orders" in another judicial or administrative proceeding and requires Qwest to promptly notify the LECs of any such subpoena or order so that "[c]onsistent with the independent authority" of the other forum the LECs have a pre-disclosure opportunity to oppose the production. (*Id.* ¶ 8). The Agreement further provides that the use of information from confidential documents obtained under the Agreement is limited "solely for the preparation and conduct of this proceeding and any subsequent judicial proceeding directly relating to this proceeding and, except as provided herein, [persons having access to the documents] shall not use such information for any other purpose, including business, governmental, commercial, or other administrative,

2

regulatory or judicial proceedings." (*Id.* ¶ 10). The Agreement vests the IUB with authority to impose sanctions for violation of the Agreement. (*Id.*) Finally, within two weeks after the conclusion of the IUB proceeding (including administrative or judicial review) the confidential documents and all copies "shall be destroyed." (*Id.* ¶ 11). The IUB's final order was the subject of a judicial review petition which was denied. Appeal was taken and denial was affirmed by the Iowa Court of Appeals and petition for review by the Iowa Supreme Court was denied. Readlyn asserts that from the last action of the Iowa Supreme Court Qwest was obligated to destroy the documents on or before June 4, 2013.

An issue arose in the development of a protective order in the Tier 1 cases concerning the use of documents produced by non-Tier 1 parties under the terms of the Protective Agreements in the IUB case. The final Tier 1 protective order entered by this Court provided that the Tier 1 parties could use all discovery and other materials produced in the IUB case. However, with respect to IUB documents produced by non-Tier 1 parties the right to use the documents was made subject to the express terms of the Protective Agreements, including specifically paragraph 8 which the Court viewed as incorporating "a simple process . . . notification sufficient to allow the disclosing party an opportunity to oppose production in this Court." (10/7/2010 Order in 07-00078 [295] at 6; *see id.*, Protective Order [302] at ¶ 21). By letters dated October

20, 2010 Qwest's counsel, Mr. Steese, wrote to the attorney who had represented the LECs in connection with the Protective Agreements, Mr. Troup, attempting to notify the LECs that Qwest would begin using the LECs' IUB documents in the Tier 1 cases unless the LECs took action to protect the information. (Qwest Mot. Ex. 3 [113-5] and Ex. 4 [90-5]). The LECs did not object. In affidavits attached to the LECs' resistances to the present motions their general managers say that Mr. Troup was no longer representing the LECs on October 20, 2010 and that they had never seen Mr. Steese's letter, facts not known to Qwest at the time. (Readlyn Resist. Ex. B [115-4], Sully Resist. Ex. D [92-3]). There is no indication what Mr. Troup did with the letters.

In these cases Qwest, in September (Readlyn) and October (Sully) 2010, served requests for production of documents, one of which, RFP 36, sought "all material you produced previously in the [IUB] proceeding . . . ." (Qwest Mot. Exs. 1 [113-2], [90-2]). The LECs objected in December 2010 on the basis of undue burden, stating that Qwest "was a party to that [IUB] proceeding, and already has the requested documents in its possession." (*Id.* Exs. 2 [113-3], [90-3]). The LECs did not object on the basis of discovery relevancy or the IUB Protective Agreements. They did make a number of non-specific, prefatory general objections. Among these the LECs objected "to the extent that [the RFPs] require the disclosure of confidential, proprietary, secret, commercially

4

protected, or other non-public information . . . ." (*Id.*) The Court disapproves of document productions made subject to "to the extent" general objections of this kind because it leaves the propounding party and the Court unclear as to what documents, if any, may have been withheld. That is not a concern with respect to RFP 36. However, objection to the discovery of a party's relevant confidential information is rarely, if ever, a basis to prevent disclosure, the usual course being to direct disclosure under a protective order. *See Federal Open Mkt. Comm. v. Merrill*, 443 U.S. 340, 362 n.24 (1979). Certainly, a broad, general objection to the production of confidential information like that put forward by the LECs is insufficient.

In May 2013 the LECs amended their privilege logs to state they would not produce documents obtained by Qwest under its IUB subpoenas and which are subject to the Protective Agreements. (Readlyn Mot. Ex. B [116] at 9; Sully Mot. Ex. B [93] at 25). The Protective Agreements did not create a privilege and the Court is not alerted to any specific IUB documents to which a recognized privilege might apply.

Ordinarily a protective order issued by one forum restricting disclosure of documents does not restrict disclosure in another forum where the documents are independently discoverable under the rules of the second forum in proceedings pending in that forum. The Protective Agreements here do not purport to do

otherwise. Paragraph 8 in the Agreement recognizes documents held confidential in the IUB proceeding may be subject to production under the "independent authority" of an other administrative agency or court, and requires notice so that the disclosing party has an opportunity to challenge the production in the other forum.[2] RFP 36 gave the required notice. Paragraph 10 provides that those who obtain access to confidential documents "under this Protective Agreement" must use the information solely in the IUB proceeding and not in any other proceeding, including judicial proceedings. By its terms this limited use provision does not restrict the recipient's use of the same documents in a separate proceeding if obtained from the LECs under the process available in that proceeding. Nor does it prohibit the recipient from using the

---

[2] Qwest filed in this Court a Fed. R. Civ. P. 45 motion to compel LEC Farmers & Merchants Mutual Telephone Company of Wayland, Iowa ("Wayland") to produce subpoenaed IUB documents for use in the *Sancom* case pending in the District of South Dakota. The Court rejected Wayland's argument that a document request did not constitute a "subpoena or order" under paragraph 8 of an identical Protective Agreement in the IUB proceeding. In so doing the Court said:

> The purpose of paragraph 8 is simply to assure notice to the disclosing party when the receiving party is required to disclose the documents or information in proceedings before another court or administrative agency. The technicality of whether or not a document request under the federal rules of civil procedure is a subpoena or order is not significant to the purpose of the paragraph.

(1/6/2009 Ruling, 4:08-mc-00036-RAW, at 10 (Mot. Ex. 6 [90-7])).

discovery tools available to it in a separate proceeding. To interpret the provision broadly as forever putting relevant documents and information beyond use in separate agency or court proceedings no matter how discoverable and relevant in those proceedings would be incompatible with the independent authority of other agencies and courts recognized in paragraph 8 of the Agreement. Here it is also appropriate to recognize the changed circumstances. The LECs are no longer non-parties. They have sued Qwest and are now subject to the discovery rules of this Court. It follows there is nothing improper or violative of the Protective Agreements in Qwest seeking production from the plaintiff LECs of the same documents produced by them in the IUB proceeding to the extent permitted by the federal rules of civil procedure. *See Sancom, Inc. v. Qwest Commun. Corp.*, 08-mc-75, Order on Motion to Compel at 3-6 (12/29/2008 N.D. Iowa)(Mot. Ex. 5 [90-6]).

In its RFP 36 Qwest, under the authority of Fed. R. Civ. P. 34, explicitly sought production of the same documents produced by the LECs in IUB proceedings. Its purpose was stated in a contemporaneous (October 26, 2010) joint consolidation motion filed in Readlyn's Northern District of Iowa cases (including 10-cv-2040) and signed by the attorney then representing both Readlyn and Sully at the time, Mr. Binder. In the motion Qwest explained it had propounded discovery in the Tier 2 cases seeking the IUB documents of Readlyn, Sully and others so that it could use the documents in

these cases. (Joint Mot. to Consolidate [29] in 10-cv-2040 at 2-3). This should have been clear to both Readlyn and Sully at the time. Neither Readlyn nor Sully objected on the basis of the Protective Agreements and, in fact, only complained about producing the documents anew because Qwest already had them in hand.[3] In light of their responses to RFP 36, Qwest could reasonably believe that the IUB documents had been produced in these cases and that it was free to use them subject to the Tier 2 protective order.[4] Only now, some two and one-half years later, have Readlyn and Sully, with new counsel, objected that the Protective Agreements bar use by Qwest of the IUB documents in these cases. The Court views these objections as having long ago been waived by failure to assert them in response to RFP 36. The Readlyn and Sully IUB documents are now in the domain of the Tier 2 cases in this Court.

No question is raised about the relevancy of the IUB documents to the claims and defenses in these cases. The IUB proceeding involved allegations that certain LECs had engaged in what Qwest refers to as improper "traffic pumping" accomplished by improperly billing Qwest for switched access charges. Qwest ceased paying Readlyn and Sully. The LECs, as plaintiffs, brought these actions against Qwest for collection of amounts allegedly owed for

---

[3] As Qwest notes, the IUB documents would have been responsive to other of its document requests.

[4] The sufficiency of the Tier 2 protective order to safeguard the confidentiality of the documents is not in question.

services provided to Qwest. Qwest answered, alleging the charges in issue were illegal and counterclaimed, seeking damages for the alleged illegal traffic pumping. It is apparent the subject matter of the IUB proceeding is closely related to the subject matter of these cases and indeed Qwest relies in part on the outcome of the IUB proceeding in support of its affirmative defenses and counterclaims. The IUB documents are thus independently subject to discovery in these cases. *See* Fed. R. Civ. P. 26(b)(1).

There is another concern with respect to the Readlyn IUB documents. Readlyn (and Sully) argue that the Protective Agreements require Qwest to now destroy the IUB documents subpoenaed from them. The motion papers reveal some question about whether Readlyn any longer has the original documents produced in response to the IUB subpoena. Naturally the Court would be most reluctant to sanction the destruction of evidence relevant in these cases. In any event, as the IUB documents now reside with Qwest as a result of its requests for production under the discovery rules of this Court they are not subject to destruction under the terms of the Protective Agreements.

The Court has considered the other arguments presented by the parties and finds it is unnecessary to address them. Qwest has filed the pending motions to compel as a vehicle to resolve the disputed issues about the affect of the IUB Protective Agreements on the discoverability and use of the IUB documents in this case.

9

There really is nothing to compel as such because Qwest has the disputed documents. The motions are **granted in part** only to indicate that the disputed IUB documents are now part of the discovery in these cases, and may be used subject to the Tier 2 protective order. This ruling only authorizes the use of the IUB documents in these Tier 2 cases.

Motions to compel ([113] in 10-cv-2040)([90] in 10-cv-218) **granted in part as above.**

IT IS SO ORDERED.

Dated this 10th day of July, 2013.

_____
ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE